# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 CR 485 | **DATE** | 11/30/2000 |
| **CASE TITLE** | USA vs. David Mooney | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. This action is set for a next status hearing on December 8, 2000 at 1:15. At that time counsel are expected to address the matters dealt with in this memorandum opinion and order and to discuss what next steps appear to be appropriate.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | DEC 0 1 2000 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | 11/30/2000 |
| | Copy to judge/magistrate judge. | date mailed notice |
| SN | courtroom deputy's initials | FILED FOR DOCKETING  00 NOV 30 |
| | Date/time received in central Clerk's Office | SN  mailing deputy initials |

Document Number

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        **DOCKETED**No.  99 CR 485
                                )
DAVID MOONEY,                   DEC 01 2000
                                )
            Defendant.          )

## MEMORANDUM OPINION AND ORDER

This Court has conducted an evidentiary hearing to consider

whether defendant David Mooney ("Mooney") "may presently be

suffering from a mental disease or defect rendering him mentally

incompetent to the extent that he is unable...to assist properly

in his defense," one of the criteria specified by 18 U.S.C.

§4241(a).[1]  To that end two witnesses testified:  Psychologist

Daniel Carlson, who is affiliated with FMC Rochester and studied

Mooney during a period of observation and study at that

institution, and private psychiatrist Richard Abrams, whom this

Court authorized to be retained by Mooney's defense counsel under

the Criminal Justice Act and who initially conducted a

psychiatric examination of Mooney and then had some follow-up

contact with him.  Psychologist Carlson, who has been a staff

psychologist at FMC Rochester for something over two years,

answered the "mental disease or defect" question in the negative,

---

[1]  All further references to Title 18's provisions will
simply take the form "Section--."

while Dr. Abrams gave an affirmative answer to that question.

After the hearing each side's counsel complied with this Court's request to identify authorities that had addressed the content of the statutory terms at issue. In that respect Dr. Carlson's testimony was that Mooney did not fit into any of the categories of mental diseases identified in the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition ("DSM-IV"). Hence Dr. Carlson viewed Mooney's mental problem as a "personality disorder"--something that a few cases later adduced by the prosecution have found does not meet the statutory standard of "mental disease or defect" (United States v. Rosenheimer, 807 F.3d 107, 111-12 (7th Cir. 1986)(per curiam) was the only Court of Appeals opinion that the government proffered on that score). For their part, Mooney's counsel have turned up only a few cases of 1960s vintage that suggest "mental disease or defect" to be terms of more flexible content.

Just a few words should be said about Rosenheimer before this Court turns to its evaluation of the testimony. After that opinion had engaged in an extensive discussion of the facts of that case and of the district court's ruling that the defendant there had been competent during the trial as well as sane at the time the criminal acts had been committed, the opinion said this (807 F.2d at 112):

> Based on the testimony presented at the hearing, the
> court found that the defendant did not suffer from any

2

mental disease or defect, but rather from a
narcissistic personality disorder which is separate and
distinct from suffering from a mental disease or
defect. Because the court properly found that
Rosenheimer failed to present "some evidence" of a
mental disease or defect, the government was not
required under the pre-1984 definition, to prove
Rosenheimer's sanity.

It would stretch that statement a great deal to read it as a
bright-line holding that there are no circumstances under which a
condition that fits a "personality disorder" pigeonhole (other
than that of narcissism), but that does not necessarily qualify
for some DSM-IV classification, can still be a "mental disease or
defect" that would render the defendant incapable of assisting
properly in his defense. In terms of this case, even if Mooney's
diagnosis were properly to be labeled as a "personality disorder"
in paper terms (as Dr. Carlson has opined), Mooney's real-life
manifestations of his condition--spontaneous violent outbursts
that escalate into clearly uncontrollable rage and physical
violence--have unquestion-ably rendered him just as incapable of
effective participation in his defense as if he were suffering
from the most serious type of mental disease. In short, even if
the "personality disorder" label were to be accepted as an apt
description, this Court would still have to conclude that
Mooney's mental state and the concomitant involuntary rages and
outrages that it has generated in the context of trial (and other
related in-court proceedings) qualify as the type of "mental
disease or defect" that satisfies the Section 4241(a) standard.

3

But as the ensuing discussion reflects, it is unnecessary to reach that issue to resolve the question facing this Court, for any such tyranny of labels is inappropriate here. This Court's law clerk has made an independent search that has cast further light on the subject by locating some additional cases. Those cases include <u>United States v. Murdoch</u>, 98 F.3d 472 (9th Cir. 1996) and <u>United States v. Hemsi</u>, 901 F.2d 293 (2d Cir. 1990), although this Court has reviewed a number of other cases as well. Of particular interest in light of Mooney's conduct and of the differing diagnoses submitted to this Court is the thoughtful and extensive concurring opinion in <u>Murdoch</u>, 98 F.3d at 477-80, which evaluated the DSM-IV categorizations as well as existing case and statutory law in careful detail and summarized that analysis in this way (<u>id</u>. at 479-80):

> Although I agree that mere personality quirks or characteristics cannot be construed as mental diseases or defects for purposes of determining legal sanity, I conclude that a personality disorder such as that suffered by Appellant is much more than a mere quirk. It is a systemic, enduring, and severe condition resulting in an extremely abnormal perception of and reaction to everyday events. In short, Appellant's condition is so encompassing and impairing that it rises to the level of a disease or defect.

> \*        \*        \*

> Of particular significance is the fact that a personality disorder is more than just a repeated pattern of behavior. It is an enduring pattern of behavior and inner experience which can affect cognition (i.e. ways of perceiving and understandings) and affectivity (emotional reactions). Therefore, it can be said to be "mental." In addition, it does not

> just manifest itself now and again in response to a
> particular set of circumstances; it is pervasive and
> inflexible. It is not just one part of a person's
> personality which is annoying, distasteful, or rude;
> it is a trait or group of traits which dominates the
> person's mental state to the point where they
> experience significant functional impairment or
> subjective distress. Thus, it comports with the
> general connotation of a "disease or defect" in that it
> is neither a temporary condition nor a chosen way of
> responding but rather a systemic, impairing psychiatric
> abnormality.

To much the same effect, Hemsi upheld a determination that a

defendant who "suffered from a major psychiatric disorder" (901

F.2d at 294) and who acted out in ways strongly similar to the

bizarre behavior that Mooney has exhibited was indeed "suffering

from a mental disease or defect rendering him incompetent to the

extent that he is unable to assist properly in his defense"

(id.).

But in terms of this case, any effort to reconcile any

differing judicial views along those lines is totally

unnecessary: This Court's evaluation of the witnesses' testimony

here obviates the need to resolve any question whether "mental

disease or defect" and "personality disorders" always occupy

discrete watertight compartments in the mental health universe,

as Rosenheimer might perhaps be read to suggest (though any such

reading is problematic at best). After careful consideration of

the testimony proffered by the two witnesses, this Court credits

that of Dr. Abrams, who draws on a wealth of experience and

expertise (see Mooney Ex. 3, Dr. Abrams' Curriculum Vita) in

expressing the firm opinion that Mooney suffers from a deep depression and feelings of worthlessness that his fits of rage tend to paper over. It is unnecessary to parse all facets of Dr. Abrams' additional and wholly cogent testimony (which should be read in its entirety to be fully appreciated), but his diagnosis of Mooney as indeed suffering from a "mental disease or defect" is totally persuasive.[2]

Indeed, Dr. Carlson's conclusion that Mooney's explosive manifestations of rage represent "volitional behavior" is totally unrealistic and is flat-out rejected by this Court (as it was by Dr. Abrams). Dr. Carlson has not observed, as this Court has on two separate occasions, the totally out-of-control violent behavior by Mooney that has manifested itself in the specific environment of trial and other legal proceedings (an environment that Dr. Carlson of course neither observed nor was able to replicate in the different matrix in which he and other personnel at Rochester necessarily dealt with Mooney). It is clear that the legal proceedings themselves trigger such uncontrollable episodes, and that there is no way to predict what seemingly innocuous factor may set off explosive behavior by Mooney (once again, something on which Dr. Carlson could not really opine).

---

[2] As background for Dr. Abrams' testimony, his March 15, 2000 letter report to Mooney's counsel (Mooney Ex. 1) and his later March 23, 2000 follow-up letter (Mooney Ex. 2) are also highly supportive of Dr. Abrams' diagnosis. Those exhibits are also attached to this memorandum opinion and order.

6

This Court concurs in Dr. Abrams' opinion that the bizarre and dangerous conduct that has been exhibited by Mooney in the specific context of trial and in his working with counsel is entirely non-volitional and is, as Dr. Abrams concluded, the product of a "mental disease or defect" within the meaning of Section 4241(a).[3]

Although what follows is really a parenthetical observation in light of this Court's crediting of Dr. Abrams' well-supported diagnosis, a word should perhaps be added about Dr. Carlson's approach and its total reliance on the DSM-IV pigeonholes. Anyone who has had occasion to address problems in the field of mental health (or its absence) has to be conscious of some fundamental difficulties with the DSM-IV definitions, which will sometimes provide (for example) that someone who exhibits four of seven specified characteristics fits a defined category of mental disease, while someone who exhibits only three of the seven does not. Even apart from the problems inherent in seeking to establish bright-line rules for exploring the arcane mysteries of the human mind, the just-described approach necessarily treats all of the characteristics at issue as somehow fungible and of

---

[3]  Dr. Abrams concluded his testimony during the hearing by characterizing Mooney as very dangerous, with the potential that during one of his episodes of uncontrolled and uncontrollable rage he "could kill someone or tear him apart." That evaluation must also be viewed as realistic, coinciding as it does with the extreme manner in which Mooney's spells of rage have manifested themselves.

equal weight, thus ascribing no significance to the subtle differences and gradations that exist in this most difficult field of diagnosis (wholly unlike the objective medical determination whether, for example, a patient has suffered a fracture).

But once again that is a digression, for this Court's ruling is grounded firmly in Dr. Abrams' wholly credible and persuasive diagnosis. In consequence of the conclusion reached by this Court, the picture that now presents itself is that Mooney is unquestionably competent for purposes of the other branch of a Section 4241(a) inquiry (he is certainly able "to understand the nature and consequences of the proceedings against him," for in his rational periods he presents himself as a highly intelligent individual with full awareness of the charge that he is facing and its potential consequences for him). This Court can express no substantive view on the merits of that charge, because the very effort to reach those merits would create the climate in which Mooney cannot function.[4] On the face of the relevant

---

[4] With Mooney and his counsel having waived a jury trial on the criminal charge against him, as Mooney was unquestionably competent to do, this Court conducted the first day of what was anticipated to be a short bench trial. During the course of that trial day this Court made some evidentiary rulings against the prosecution and other evidentiary rulings against the defense. At the conclusion of the day Mooney reacted with extreme and frightening violence in direct consequence of the adverse rulings, even though his counsel had apparently told him that they believed things were going quite well in substantive terms.

8

statutes, that seems to create a vicious procedural circle:

1. Under the literal provisions of Section 4241(d) this Court is mandated to commit Mooney to the custody of the Attorney General for hospitalization "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." As certain as a negative answer to that determination would appear to be in light of (a) Mooney's prior conduct and (b) Dr. Abrams' diagnosis, the statute appears to be unambiguous, leaving no room for discretion.

2. If at the end of the procedure and the time frame specified in Section 4241(d) "it is determined that the defendant's mental condition has not so improved as to permit the trial to proceed," Section 4246 will kick into operation.

3. In literal terms, Section 4246(a) calls for a certification by the director of the facility in which Mooney is then hospitalized that Mooney is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and...suitable arrangements for State custody and care of the person are not available...." That then would return the matter to this Court to conduct a hearing on that

score.

4. If that hearing were then to result in an affirmative finding by clear and convincing evidence that the earlier-quoted situation still exists, this Court would then be obligated to recommit Mooney to the custody of the Attorney General (Section 4246(d)). In turn the Attorney General would be obligated to make all reasonable efforts to cause the State of Illinois to assume responsibility for Mooney's "custody, care and treatment," failing which his hospitalization in a federal facility would be required.

Although this Court does not of course prejudge the results of any of the several steps just outlined, it has a deep concern that Mooney may well face long-term (even lifetime) commitment for a charged offense as to which he has not been found guilty and that, even if he _were_ convicted, would not call for anything remotely approaching such a result.[5] In all events, this matter is set for a next status hearing at 1:15 p.m. on December 8,

---

[5] Mooney has already been held in custody for an extended time frame, so much so that he has said at one point during the proceedings that if he were to be found guilty or to plead guilty (as he is not prepared to do), the Sentencing Guidelines calculation would call for his immediate release. This Court has not of course explored that issue, which does not now pose a matter ripe for judicial determination because it is entirely hypothetical. And because of the proper constraints on judicial involvement that are contained in Fed. R. Crim. P. 11(e)(1), this Court is also unaware whether any consideration may have been given to the possibility of a North Carolina v. Alford plea, which would not involve an admission of guilt on Mooney's part but could cause his prompt release from custody if he is right.

10

2000.  At that time counsel are expected to address the matters
dealt with in this memorandum opinion and order and to discuss
what next steps appear to be appropriate.

Milton I. Shadur
Senior United States District Judge

Date:   November 30, 2000

## Richard S. Abrams, M.D.,S.C

**Offices:** 2800 N. Sheridan Rd., Suite 206,        1100 W. Central Ave., Suite 404,
Chicago, IL 60657                                              Arlington Hts., IL 60005
**Mail address:** P.O. Box 148033, Chicago, IL 60614, USA
**TEL:** 1 773/348 7003  **FAX:** 1 847/256 7880  **E-Mail:** Abraham198@AOL.com

Certif. Amer. Bd. Psychiatry

## CURRICULUM VITA

**Born:** Chicago, Illinois, USA, February 22, 1933.

**Staff:** Northwestern Memorial Hospital in Chicago, IL., from 1970-1991. Associate in Psychiatry and teaching staff of Northwestern Medical School.

Attending staff, Northwest Community Hospital, Arlington Hts., IL., 1986 to present.

Attending staff Grant Hospital, Chicago, IL., since 1976. Director of Psychiatry, 1976-1980. Director Quality Assurance Committee for Psychiatry, 1992 - present.

Attending staff of Mercy Hospital, Chicago, IL., 1996 to present.

**Board Certification:** Jan., 1976, American Board of Psychiatry and Neurology. Certificate #14483.

**Consultant** to Chicago Public Schools 1973-1977. Duties were teaching classroom, special education, adjustment teachers and social workers. I gave formal and informal seminars and lectures to Board of Education nurses and school psychologists, with accreditation through National College of Education.

**Past Training and Experience:** Graduate of Northwestern University, undergraduate (1955) and Medical schools (1958), with BS and MD degrees. **Internship:** rotating at Cedars-Sinai Medical Center, Los Angeles, CA 1958-1959. **Residency:** general surgery, 2 years, 1959-1961, at Michael Reese Hospital in Chicago. **Residency:** general surgery from 1961-1963 at Grasslands Hospital, Valhalla, NY **Residency:** psychiatry from 1964-1968 at the Boston Veterans' Hospital in Boston, MA. This included training in long term analytically oriented psychotherapy, with intensive supervision of in and out-patients, using the facilities of the 1000 bed VA general hospital and outpatient clinics. Two years were spent at Tufts-New England Medical Center, gaining experience with female patients. One year, part time, was spent in the study of child psychiatry. Individual and group psychotherapy was practiced with mentally retarded patients attending the Fernald School. Throughout the training program, I led a minimum of two groups. The views of my supervisors were highly varied, including traditionally

psychoanalytic, reality oriented and behavioristic methodologies. Emphasis was placed on intensive, long-term involvement with patients. A personal analysis was included in the program. On weekends during the training program, I staffed the emergency room at St. John's Hospital in Lowell, MA and covered the private practices of general practitioners.

In 1969, I was staff psychiatrist at New York Medical college and Metropolitan Hospital in New York City. I also maintained a private practice in psychiatry in Fort Lee, NJ.

In 1970 I joined the private practice group of Professor Dr. Benjamin Boshes, Chairman of the Dept. of Psychiatry at Northwestern Medical School and hospitals. In 1974, I left the group to establish my own private practice of psychiatry, which I maintain to the present, with offices in Chicago and Arlington Hts., Illinois. I treat patients from about age 15 to geriatric age in the offices and in the hospitals. Diagnoses range include the psychoses, personality disorders, neuroses, organic dementias, and alcohol/drug addictions. I perform child custody evaluations and practice forensic psychiatry.

From 1976 - 1980, as the Director of Psychiatry at Grant Hospital, my duties were to develop an inpatient psychiatric unit. I also supervised staff of the outpatient clinic.

From 1985-1993 I served as staff psychiatrist for the Institute of Psychiatry of the Criminal Court of Cook County, examining those persons charged with crimes, at the pre indictment and indictment levels, for fitness to stand trial and for sanity determination. I also examined and evaluated families who were embroiled in divorce and child custody issues.

Since 1985 I have been an official examiner for the U.S. Social Security Administration, determining eligibility of applicants for disability benefits.

I am a member of the American College of Forensic Examiners.

Publications available upon request.

LS×1

# Richard S. Abrams, M.D.,S.C

**Offices:** 2800 N. Sheridan Rd., Suite 206,        1100 W. Central Ave., Suite 404,
Chicago, IL 60657                                    Arlington Hts., IL 60005
**Mail address:** P.O. Box 148033, Chicago, IL 60614, USA
**TEL:** 1 773/348 7003 **FAX:** 1 847/256 7880 **E-Mail:** Abraham198@AOL.com

Certif. Amer. Bd. Psychiatry
3/15/2000
Re: David Mooney

Mr. Thomas Durkin and Patrick Blegen,
53 W. Jackson Blvd.
Chicago, IL 60606

Dear Sirs,

At your request, I performed a psychiatric examination of this person at the Metropolitan Correctional Center on 2/14/2000, in order to determine his mental state at the time of the alleged crime, which occurred in July, 1999. During the course of my examination, questions arose as to his competency to stand trial.

I spent about 1-½ hours with him alone. He is a 33-year-old, single, childless male who has been in prison for about 8 months. He is alleged to have threatened to kill President Clinton. He stated that he had been a very heavy alcohol drinker for many years; since age 17. He was drinking a case of beer per day as well as 1/5th gallon of hard liquor! He has, over the years, had thoughts of killing himself. In fact, he overdosed at age 20 and was taken to an emergency room, but was not hospitalized. Just prior to his arrest, he stated that he wanted to be locked up so he could be treated, feel better and for fear that he would lose control of his severe hostility. He stated that he called the police and the FBI for that purpose. A Government agent interviewed him and he threatened to harm her also.

When I asked him why he had not been treated for alcoholism before, he stated that he never had money for private treatment and could not find an available public inpatient facility. Just prior to his arrest, he contacted a Priest, but could not secure a treatment program, even with his help.

He left home at age 16. His stated that "my biological father was a N----- (African Black man) who had a one night stand with my slut white mother." He never had contact with either of his natural parents. At all times during the interview, he showed extreme anger and appeared to be almost out of control of his violent impulses many times. At first, he was furious when I asked about his earlier life, and he refused to talk of that, but toward the end of the session, he revealed that he was raised by another woman, in Ireland, who also had 6 older children. He was treated as a black sheep, denied butter for his bread, salt for his potatoes, and received nothing but left-overs of food, clothing, bedclothes, etc. Often, he was locked in a room and had to urinate on the floor. He said that he was sent to boarding school from ages 8 to 16 and was only visited twice per year by any family member. On the contrary, the other children received regular and frequent visits. During the summers, he was allowed to come home, but was denied access to the house; instead being forced to do outside chores, while the other children had the run of the house, snacks, and better meals and lots of attention. "Mother would look out of the window and make faces at me." He felt



DEFENDANT'S EXHIBIT
ABRAMS REPORT

that his presence was barely tolerated. He never recalls ever having been hugged or kissed by any family member. He felt humiliated, helpless, unloved, and learned to hate himself and the others. "They destroyed my life and made a monster of me."

At age 16, he lived in the streets, learned to steal, forge checks, and beg for handouts. "I never developed any emotional bonds." He lived in London, Spain, Mexico, and finally he came to the US. During those years, he continued heavy drinking and periodically would threaten, by long distance telephone, various family members, unleashing his rage at them. He worked off and on, for 9 years as a retail broker and as a commodity broker. His longest employment at any one job was 2 years. He received a bachelor and a master degree, the latter in economics. There was no history of hallucinations, drug abuse, or major physical illnesses or operations. He takes no medications.

**His mental status exam** showed no limp, tremor, or obvious deformity. There was very poor eye contact. He was constantly and severely angry and threatened numerous authority figures. I explained to him the possibility of being discharged from jail if the authorities felt that he would not harm anyone. "F--- them all, I won't keep quiet, I won't do what they want, I won't take any medication. One day I'll kill my (family)." I could not reason with him. At one point, he saw my pen and stated that he could kill me! His IQ from the clinical exam appeared above average. He was rational, alert, hypervigilant, untrusting, loud, and talked in a brave way, considering his position. At one point, I noticed a tear in his eye, but he would not let himself express the deep depression and sense of hopelessness that I perceived. He stated that he would stay in the jail "as long as they wanted. F--- them." He showed only intellectual, but not emotional insights into the nature of his conflicts and showed no motivation for such. Memory, ability to calculate, fund of knowledge and ability to abstract, all appeared intact.

I reviewed various records in your office. They indicate that he was reported to the authorities in Ireland for threatening members of his family. In fact, it is possible that the Irish authorities would arrest him and put him on trial for those allegations. When he was young, there is reference to him causing a bomb scare in a school. In our discussion, it was revealed that at a Court appearance, he lost control of his anger and disrupted the proceedings.

**The report of his psychiatric status by the Federal Medical Center in Rochester, Mn., dated 9/10/99,** states:

"Due to Mr. Mooney's disruptive and uncooperative behavior, no psychological testing was attempted." The history they obtained was more or less the same as the history I learned from Mr. Mooney. "Correspondence between Interpol-Dublin and the US indicated Mr. Mooney was alleged to have made a number of recent telephone calls to various family members during which he threatened them with bodily harm.... He reported his alcohol intake increased to approximately 30 beers and up to 1 ½ pints of tequila per day!...Mr. Mooney remembered multiple admissions for alcohol detoxification at various centers in Chicago, but denies other psychiatric inpatient admissions....Mr. Mooney arrived at FMC Rochester on July 29, 1999. He was uncooperative with the intake process and was very loud,

threatening and physically agitated: He denied symptoms of depression. His mood was angry. Clinicians noted no overt signs of a thought disorder or gross cognitive deficit.....He reportedly pulled a toilet seat off the wall, stating; 'I'll kill anyone that comes near me.'......He received several additional incident reports during the first week of his stay at FMC Rochester. He remained in the locked unit for his entire stay, due to extremely disruptive and threatening behaviors at various times throughout the evaluation period.....The following morning, he apologized to the Officer and asked for a pen and paper to write apologies to all the staff members he had offended. He was observed by staff to be calm, articulate, lucid, and coherent during interactions that day.

Three days later, however, Mr. Mooney refused to put on leg irons for his physical examination. Despite being informed of the reasons for the leg irons, Mr. Mooney became irate, loud, and argumentative and he was not redirectable. Similarly, on August 3, 1999, he requested Tylenol for tooth pain and when he was told he could not have a larger dose than that which was ordered, he became verbally abusive and demanding. Finally, after receiving an order for more medications, the nurse noted that he controlled his behavior for several minutes to enable her to open the trap door. She reported that once the trap door was opened, he slapped the medications and water off the trap door. She reported that he stated, 'next time you reach your arm over here, I will f---ing pull it off. Write me up you f---ing bitch.'....He began banging and pounding on his cell wall and door and would not respond to redirection. The next day, he was observed by staff trying to remove his desk from its bolts in the floor and wall. He reportedly made threats to harm staff with the desk. He succeeded in pulling the desk out of its floor bolts, continuing to make threatening comments toward staff. He hid under the bed so he could not be effectively monitored. He also threw food around his cell on occasion and pounded on the wall of his cell, yelling at the inmate next door. 'I get angry easily.'...When the defendant returned from his (dental) appointment, he demanded pain medication and when this was not delivered promptly, he flooded the toilet in his cell while laughing and swearing at the staff. In total, Mr. Mooney received incident reports for making verbal threats, refusing to obey orders, 2 counts of destruction of property, and multiple counts of insolence. He was found competent and responsible for all the charges. **The majority of his behavioral outbursts appeared to be in response to clear precipitating factors, often involving his requests and demands not being immediately gratified.** He exhibited no apparent psychotic symptomatology during the course of his evaluation. He demonstrated no confusion or disorganization of thought and consistently denied auditory and visual hallucinations. He slept and ate well, he was active, and he displayed no problems with concentration and memory."

"While he has evidenced some disruptive and destructive behavior while at FMC-Rochester, **these behaviors appeared volitional** and seemed to be a reaction to specific precursors. This contrasts with what one would expect of an individual in a manic state....The fact that there was no mention in available records of the use of psychotropic medications suggest that the admission ( at Chicago Reed Hospital) was related to the defendant's use of alcohol, as he asserts. Mr. Mooney's behavior during his stay at FMC-Rochester suggests he has a severe personality disorder that includes antisocial and borderline (psychotic) personality traits, although the defendant does not appear to meet full diagnostic criteria for either personality disorder. Like individuals with borderline personality disorder, the defendant has frequently displayed affective instability, his moods are markedly reactive to stress's, leading to intense expressions of anger, irritability and dysphoria that can quickly abate when the stressor is removed. He has displayed inappropriate, intense anger and difficulty controlling his temper......Dx: alcohol dependence, in early full remission in a controlled environment and personality disorder, NOS with

page 4 - Mooney

borderline and antisocial traits,....He has proven his ability to refrain from disruptive behavior during the latter part of his stay. The greatest potential obstacle for his participation in the legal process is attributable to his maladaptive personality characteristics and the related danger that he may choose to display inappropriate or disruptive behavior in court or during interactions with defense counsel. His potential unwillingness, however, should not be confused with an inability to participate in the proceedings or collaborate with his attorney if he decides to do so."

**Summary:** In my carefully considered opinion, the above report has contradictions. There would be no logical, conscious, adult reason why anyone would act so badly while in prison. What would Mr. Mooney have to gain in a logical adult sense? However, it is my opinion that, as a result of his unconscious (infantile) thinking and logic, he might be masochistically seeking severe and long-lasting punishment, severely negative attention and/or he might be expressing hatred toward the prison authority figures, being displaced from his original family whose members he clearly has hated for many years. Indeed, he made numerous threats to them of bodily injury. He threatened to kidnap their child and cut her finger off to prove that she was in his possession and as a punishment to his relatives! Clearly, he was cold sober during the course of the FMC evaluation, yet he behaved in an extremely hostile fashion. Surely, this could not be attributed to alcohol intoxication or withdrawal, and he was not treated for such. In fact, I observed the precise, same thinking and behavior (after many months of sobriety) during my examination of him in the jail.

It is obvious that Mr. Mooney is highly intelligent and articulate, and I would concur that he can understand all that is happening in a superficial, intellectualized way, **but I strongly disagree that he has more than minimal capacity, at an emotional level, to understand the seriousness and precariousness of his present and future position.** The FMC admits that he reacts severely to known precipitants. Of course that makes sense. A grossly psychotic person does the same, but his perceptions are so idiosyncratic, that often it is not possible to connect the reactive thinking and behavior with a specific precipitant. Therefore, I state that he is not and has not been psychotic in the strict definition of that diagnosis, however, his ability to react rationally to common, normal adversities is almost non-existent. Evidence for this is supplied by the FMC report. I strongly believe that it is naive and unsophisticated of FMC to state, **"these behaviors appeared volitional."** They surmise that his reactions were volitional and consciously goal-directed. It would make no adult, logical sense at all for anyone to react this way, especially with the consistency as Mr. Mooney did. His almost paranoid misperceptions of common adversities are responsible for his severe reactions. With regard to the FMC statement that he does not suffer from depression, how could anyone with such a history and with no emotional connection with humans (or animals) not be significantly and chronically depressed? I maintain that his terrible self esteem, his self-hatred and his inability to have any functional human relationships have produced a severely chronic, affective depression which he consciously denies, yet defends against by the terrific rage and violent acting out behavior which has been duly recorded.

The non-use of psychotropic medication at Reed Hospital does not necessarily imply the diagnosis of only alcoholism, or indicate a lack of serious mental illness, but may indicate that such a diagnosis was not made. It also may have been due to his refusal to take any medication.

I spoke with the defendant's attorneys, Thomas Durkin and Partrick Blegen, regarding their personal visit with the defendant on 3/11/00 and their conversation with Mr. Mooney on 3/13 per phone. It is my understanding that at the 3/11 meeting, Mr. Mooney prematurely and abruptly terminated the meeting and demanded a different attorney. This would be consistent with his sudden and impulsive reactions to stress already mentioned. It is my understanding that during the telephone conversation of 3/13 between Mr. Mooney and his attorneys, he had no recollection of having demanded different attorneys and also was adamant that he could cooperate with his attorneys and did not wish for the issue of Competency to Stand Trial to be raised.

**Conclusion:** He suffers from severe and chronic major depression, recurrent, with easily triggered (perceived) threats to his self-esteem, uncontrollable, explosive rage, borderline psychotic and antisocial features, as well as alcoholism, the latter now being in remission only because he is incarcerated. **The precipitants, frequency and intensity of his rages are unpredictable. During them, he would most likely be very dangerous.**

When threats to his self-esteem and his responses with rage occur, he is emotionally blinded, thereby making cooperation and understanding impossible. He refuses to take medication, especially neuroleptics, which would, more or less, protect him against this mental anguish and insure his competency and his ability to stand trial. During his less stressful times, even though he suffers from a mental disease, I believe that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. Therefore, **he would be fit for trial.** However, it is not possible to know when what quality and quantity of stress would present itself, and it is most likely that at some points during the course of his trial, his thinking and perceptions would become confused and disorganized and rage would occur. During those times, he would not be capable of assisting in his defense, would be mentally incompetent and, therefore, **not fit for trial.**

3/23/2000. Today I received a (collect) call from David Mooney. He stated that he read my report, given to him by his attorney, and was going to "tear it up and throw it into the toilet." His voice was loud and very angry. He accused me of denying that I was a psychiatrist when I examined him in the jail, 2/14/2000. He used much profanity. When I again suggested that he stop threatening people with harm, he re-affirmed that he had no respect for the authorities, would not "kiss their a.....s" and would not give respect to "your government." He seemed to have no recollection of that fact that his attorney had notified him of my pending visit for the exam on 2/14/2000, that I indeed identified myself as a psychiatrist sent by his attorney to help him, and that he told me, during the exam, "I could kill you (too) with your pen."

I called your office to relate this conversation with you, and you informed me that you also spoke with him a day or two earlier. You stated that Mr. Mooney was rational and again expressed his desire to not be found unfit for trial; that he felt he could be calm and peaceful in the courtroom. However, later in your conversation with him, he again became irrational, very angry, loud and threatening.

These recent behaviors further document the fact that Mr. Mooney can easily be triggered to become very hostile and untrusting, with its attendant forgetfulness and an unawareness of what he is expressing or an amnesia for those moments.

Sincerely,

Richard S. Abrams, MD

RA/js

△×2

## Richard S. Abrams, M.D.,S.C

Offices: 2800 N. Sheridan Rd., Suite 206,      1100 W. Central Ave., Suite 404,
Chicago, IL 60657                    Arlington Hts., IL 60005
Mail address: P.O. Box 148033, Chicago, IL 60614, USA
TEL: 1 773/348 7003 FAX: 1 847/256 7880 E-Mail: Abraham198@AOL.com

Certif. Amer. Bd. Psychiatry

Mr. Thomas Durkin and Patrick Blegen,      3/23/2000
53 W. Jackson Blvd.                   Re: David Mooney
Chicago, IL 60606

Dear Mr.'s Durkin and Blegen,

   Today I received a (collect) call from David Mooney. He stated that he read my report, given to him by his attorney, and was going to "tear it up and throw it into the toilet." His voice was loud and very angry. He accused me of denying that I was a psychiatrist when I examined him in the jail, 2/14/2000. He used much profanity. When I again suggested that he stop threatening people with harm, he re-affirmed that he had no respect for the authorities, would not "kiss their a....s" and would not give respect to "your government." He seemed to have no recollection of that fact that his attorney had notified him of my pending visit for the exam on 2/14/2000, that I indeed identified myself as a psychiatrist sent by his attorney to help him, and that he told me, during the exam, "I could kill you (too) with your pen."

   I called your office to relate this conversation with you, and you informed me that you also spoke with him a day or two earlier. You stated that Mr. Mooney was rational and again expressed his desire to not be found unfit for trial; that he felt he could be calm and peaceful in the courtroom. However, later in your conversation with him, he again became irrational, very angry, loud and threatening.

   These recent behaviors further document the fact that Mr. Mooney can easily be triggered to become very hostile and untrusting, with its attendant forgetfulness and an unawareness of what he is expressing and/or an amnesia for those moments.

         Sincerely,

RA/js                   Richard S. Abrams, MD

Def.Ex. 2